UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BEHNAM GOORAKANI,<br><br>                 Petitioner,<br><br>      v.<br><br>TODD M. LYONS, et al.,<br><br>                 Respondents. | 25 Civ. 9456 (DEH) |
| RONALD ALEXANDER MEJIA SEGOVIA,<br><br>                 Petitioner,<br><br>      v.<br><br>WILLIAM P. JOYCE, et al.,<br><br>                 Respondents. | 25 Civ. 9551 (DEH) |
| E.M.M.,<br><br>                 Petitioner,<br><br>      v.<br><br>JUDITH ALMODOVAR, et al.,<br><br>                 Respondents. | 25 Civ. 9592 (DEH) |
| CHAONAN PANG,<br><br>                 Petitioner,<br><br>      v.<br><br>JUDITH ALMODOVAR, et al.,<br><br>                 Respondents. | 25 Civ. 9952 (DEH)<br><br>**OPINION**<br>**AND ORDER** |

DALE E. HO, United States District Judge:

In these cases, Behnam Goorakani, Ronald Alexander Mejia Segovia, E.M.M.,[1] and Chaonan Pang (collectively, "Petitioners") each challenge the lawfulness of their respective detentions by Immigration and Customs Enforcement ("ICE"). *See* Pet. for Writ of Habeas Corpus ("Goorakani Petition"), ECF No. 1 (25 Civ. 9456); Pet. for Writ of Habeas Corpus ("Mejia Segovia Petition"), ECF No. 1 (25 Civ. 9551); First Amended Pet. for Writ of Habeas Corpus ("E.M.M. Petition"), ECF No. 9 (25 Civ. 9592);[2] Pet. for Writ of Habeas Corpus ("Pang Petition), ECF No. 1 (25 Civ. 9952).  For the reasons stated herein, the Petitions are **GRANTED**.

## BACKGROUND

### I.    Behnam Goorakani

Behnam Goorakani is a citizen of the Islamic Republic of Iran.  *Id.* ¶ 1.  Respondents[3] contend that "[i]n March 2024, [Mr. Goorakani] . . . unlawfully entered the United States from Mexico at or near San Ysidro, California, without inspection, admission, or parole from an immigration officer."  ECF No. 12 at 1 (25 Civ. 9456).  Mr. Goorakani applied for asylum around the same time.  Goorakani Petition ¶ 8.  On March 6, 2024, Customs and Border Protection ("CBP") served Mr. Goorakani with a Notice to Appear ("NTA") charging him with being inadmissible under Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"),

---

[1] Petitioner E.M.M. moved to proceed using his initials, and for his alien registration number to be redacted from any documents contained in the record.  ECF No. 3 (25 Civ. 9592).  The Court granted this motion, ECF No. 6 (25 Civ. 9592), and will accordingly refer to E.M.M. by his initials in this Opinion.

[2] E.M.M. filed an Amended Petition on November 20, 2025, following a decision by the Board of Immigration Appeals vacating an Immigration Judge's order that he be released on bond.  For purposes of this Opinion, the First Amended Petition is E.M.M.'s operative Petition.

[3] The "Respondents" in these four cases are not identical, but they are all Department of Homeland Security ("DHS") officials responsible for the detention of the Petitioners.  The Court therefore uses "Respondents" and "the Government" interchangeably—when discussing a particular case, to refer to the specific Respondents in that case; and when making general points about all four cases collectively, to the Respondents in these cases generally.

codified at 8 U.S.C. § 1182(a)(6)(A)(i), as a noncitizen[4] present in the United States "without being admitted or paroled."  Goorakani Petition Ex. A; ECF No. 12 at 1 (25 Civ. 9456).  The next day, Mr. Goorakani was released on his own recognizance.  ECF No. 12 at 1 (25 Civ. 9456).

Since his release, Mr. Goorakani has established "strong ties to the United States." Goorakani Petition ¶ 44.  He has an "established relationship with Saint Mary the Virgin Episcopal Church in Times Square" where he "actively practices his Christian faith."  *Id.* ¶ 44.  "[H]e has no criminal history whatsoever."  *Id.* ¶ 45.  Mr. Goorakani's application for asylum remains pending and no final order of removal has been issued.  *Id.* ¶ 34.

Mr. Goorakani has actively participated in his immigration proceedings.  On April 11, 2025, Mr. Goorakani reported to Immigration Court at 26 Federal Plaza in New York, where he sought clarification as to when his next required appearance was, *id.* Ex. B, had his documents stamped, *id.*, and "was told to go home."  *Id*. ¶ 10.  Respondents assert that Mr. Goorakani "failed to report to ICE as directed . . . in April 2025," but provide no documentation or declaration to support that assertion.  ECF No. 12 at 1 (25 Civ. 9456).  Subsequently, Mr. Goorakani was directed to report to 26 Federal Plaza on July 1, 2025.  Goorakani Petition ¶ 11.  He states that he attempted to report as directed, but a psychological emergency prevented his attendance.  *Id.* ¶¶ 11-12.

Despite this, Mr. Goorakani then appeared at a scheduled check-in on August 4, 2025 where he "was detained by ICE and placed in a detention facility."  *Id.* ¶¶ 13-15.  Mr. Goorakani alleges that he was "detained . . . without . . . any determination that he poses a flight risk or a danger to the community."  *Id.* ¶ 41.  He asserts this is "pursuant to ICE policy, according to which ICE indiscriminately, and without valid basis or justification, arrests noncitizens . . . who voluntarily attend check-in meetings scheduled by ICE."  *Id.* ¶ 37.

---

[4] This Opinion uses the terms "alien" and "noncitizen" interchangeably.

3

After his arrest, Mr. Goorakani was taken to "a holding room at 26 Federal Plaza for processing." ECF No. 12 at 1 (25 Civ. 9456). Respondents claim—but provide no substantiating documentation or declaration—that ICE served Mr. Goorakani with an I-200 warrant under section 235 of the INA, codified at 8 U.S.C. § 1225(b). *Id.* It is not clear from the record where Mr. Goorakani was detained between his arrest on August 4, 2025 and August 8, 2025, but on the 8th, he was transported to New York Presbyterian Hospital "due to medical/mental health issues." *Id.* at 2; *see also* Goorakani Petition ¶ 16 ("Due to overwhelming psychological trauma, panic, and the underlying conditions previously documented in his psychological evaluation, . . . including anxiety, post-traumatic stress, and chronic pain, he was unable to eat or drink for the entire duration of his detention.").

Mr. Goorakani filed his habeas petition pursuant to 28 U.S.C. § 2241 on November 12, 2025 seeking "immediate release . . . from ICE's custody, and/or release under reasonable conditions of supervision or any less restrictive alternative . . . ." Goorakani Petition at 18. This matter was assigned to the undersigned the following day, November 13, 2025. On November 14, 2025, this Court, in order to preserve its jurisdiction, directed that Mr. Goorakani not be removed from the country during the pendency of this litigation. ECF No. 4 (25 Civ. 9456). It further ordered Respondents to show cause why the Petition should not be granted by November 19, 2025; instructed Mr. Goorakani to submit any Reply by November 21, 2025; and scheduled a hearing for November 25, 2025, at 3:30 p.m. *Id.*

On November 17, 2025, Respondents requested an extension of time to file their response, ECF No. 6 (25 Civ. 9456), which Petitioner opposed, ECF No. 8 (25 Civ. 9456). The Court granted Respondents' application in part, extending the briefing deadlines to November 21, 2025 and November 24, 2025, respectively. ECF No. 9 (25 Civ. 9456). On November 21, 2025, the day Respondents' filing was due, Respondents filed a second motion for extension of time. ECF No.

12 (25 Civ. 9456).  For the reasons stated in an Order issued on that date, the Court denied

Respondents' application.  ECF No. 13 (25 Civ. 9456).

Accordingly, Respondents filed their opposition on November 21, 2025, in the form of a

letter brief explaining that the Court's decision on the principal legal issues in its opinion in *Lopez*

*Benitez v. Francis*, 795 F. Supp. 3d 475 (S.D.N.Y. 2025), would control in this case, but reserving

their right to appeal.  ECF 12 at 2-3 (25 Civ. 9456).  Respondents stated that the Court could

"decide this matter without further briefing."  *Id.*  at 3.

In light of these concessions, on November 23, 2025, the Court issued an order canceling

the November 25 hearing, granting the Petition, and ordering that Mr. Goorakani be released from

custody no later than November 24, 2025, at 5:00 p.m.  Order, ECF No. 15 (25 Civ. 9456).  It

further directed Respondents to certify compliance with the Court's order on the docket.  *Id.*  The

Court noted that this Opinion and Order would follow.  *Id.*

On November 25, 2025, Respondents certified by letter that Mr. Goorakani was released

from ICE custody and discharged from the hospital on November 24, 2025.  ECF No. 16 (25 Civ.

9456).  Mr. Goorakani had been detained for more than three and a half months.

## II.    Ronald Alexander Mejia Segovia

Ronald Alexander Mejia Segovia is a citizen of El Salvador.  Mejia Segovia Petition ¶ 1.

Respondents assert that he entered the United States on February 24, 2016.  ECF No. 10 at 1 (25

Civ. 9551); ECF No. 11-1 (25 Civ. 9551).  On April 4, 2016, Mr. Mejia Segovia was arrested by

CBP pursuant to a Form I-200 warrant under section 236 of the INA.  ECF No. 10 at 1 (25 Civ.

9551); ECF No. 11-1 (25 Civ. 9551).  After his arrest, Mr. Mejia Segovia claimed a fear of

persecution in his home country, and an asylum officer determined that his fear was credible.  ECF

No. 10 at 1 (25 Civ. 9551).  CBP served Mr. Mejia Segovia with a Notice to Appear charging him

with being inadmissible under Section 212(a)(7)(A)(i)(l) of the INA.  ECF No. 11-3 (25 Civ.

9551).  The NTA designated him as "an alien present in the United States," and not as "an arriving alien."  *Id.*  On April 4, 2016, Mr. Mejia Segovia was released on bond, memorialized in a Form I-286 Notice of Custody Determination, which again cited section 236 of the INA.  ECF No. 11-4 (25 Civ. 9551).

Since his release on bond in 2016, Mr. Mejia Segovia has lived in the United States with his mother and siblings, who are legal permanent residents, and his stepfather, who is a U.S. citizen.  Mejia Segovia Petition ¶ 1.  On February 21, 2017, he filed an application for political asylum.  *Id.*  He also applied for and received authorization to work in the United States.  *Id.*

Despite an upcoming hearing on the merits for his asylum claim, ICE arrested Mr. Mejia Segovia on November 14, 2025 while he was walking his sister's dogs in his Bronx neighborhood.  *Id.* ¶ 2; ECF No. 11 at 1 (25 Civ. 9551).  The Form I-200 warrant for that arrest again cites section 236 of the INA.  ECF No. 11-5 (25 Civ. 9551).  There is no indication that any kind of individualized custody determination was made at that time.  Following his arrest, Mr. Mejia Segovia was detained at the Orange County Jail in Goshen, New York.  ECF No. 10 at 1 (25 Civ. 9551).

The same day that he was taken into custody, Mr. Mejia Segovia filed a habeas petition pursuant to 28 U.S.C. § 2241 challenging his detention as unlawful and seeking an order requiring his immediate release.  Mejia Segovia Petition at 9-10.  On November 17, 2025, this Court ordered Respondents to show cause as to why Mr. Mejia Segovia's Petition should not be granted pursuant to this Court's decision in *Lopez Benitez*, 795 F. Supp. 3d 475.  ECF No. 5 (25 Civ. 9551).  The Government responded on November 20, 2025, reserving its right to appeal, but conceding that this Court's decision in *Lopez Benitez* "would appear to control the result" of Mr. Mejia Segovia's Petition because of the similar facts and "nearly identical due process claims" at issue.  ECF No.

10 at 3 (25 Civ. 9551).  The Government further stated that the Court could "decide this matter without further briefing."  *Id.*

In light of these concessions, on November 21, 2025, the Court issued an order granting Mr. Mejia Segovia's Petition and ordering that he be released from custody no later than November 22, 2025 at 5:00 p.m., noting that this Opinion and Order would follow.  ECF No. 13 (25 Civ. 9551).  On November 22, 2025, the Government certified by letter that Mr. Mejia Segovia was released from ICE custody.  ECF No. 14 (25 Civ. 9551).

## III.    E.M.M.

E.M.M. is a citizen of El Salvador.  Declaration of Deportation Officer Mincheol So ("So Decl. 1") ¶ 3, ECF No. 15 (25 Civ. 9592).  He has lived in New York for the past 18 years.  E.M.M. Petition ¶ 16.  Respondents state that ICE officers encountered E.M.M. while executing a criminal warrant for a different individual at an address where E.M.M. was also present.  So Decl. 1 ¶ 4. Respondents further claim that E.M.M. fit the physical description of the wanted individual, though they provide no substantiating documentation.  *See id.*  Respondents assert that after questioning E.M.M., the officers determined that he did not have legal status and placed him under arrest.  *Id.*  On May 19, 2025, ICE served E.M.M. with a Form I-200 warrant for his arrest under Section 236 of the INA.  *Id.* ¶ 6; ECF No. 14-2 (25 Civ. 9592).  The warrant includes a checklist of possible bases for probable cause, but none are checked.  ECF No. 14-2 (25 Civ. 9592).  There is no indication that any kind of individualized custody determination was made at the time of his arrest.  ICE also served E.M.M. with an NTA charging him with being inadmissible under Section 212(a)(6)(A)(i) of the INA, as a noncitizen present in the United States "without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General."  ECF No. 14-1 at 1 (25 Civ. 9592).  On the same day, he was booked into Orange County Jail.  So Decl. 1 ¶ 7.

In a July 29, 2025 immigration court hearing, the Immigration Judge found E.M.M. removable and adjourned proceedings for an August 14, 2025 hearing to submit relief applications. *Id.* ¶ 16. E.M.M. filed a Bond Redetermination Request on August 1, 2025, seeking release on bond pursuant to 8 U.S.C. § 1226(a). *Id.* ¶ 17. On August 11, 2025, an Immigration Judge held a bond hearing and granted E.M.M.'s request, ordering him released from custody on a bond of $7,500. *Id.* ¶¶ 18-19. Later, in an August 29, 2025 written decision memorializing the August 11 order, the Immigration Judge clarified that Petitioner was detained subject to 8 U.S.C. § 1226(a). *Id.* ¶ 23.

On the same day as E.M.M.'s bond hearing, DHS filed Form EOIR-43, Notice of Service Intent to Appeal Custody Redetermination, invoking an automatic stay of the Immigration Judge's bond order; this form did not require DHS to articulate any basis for the stay or make any individualized, fact-specific arguments. *See Id.* ¶ 20; ECF No. 1-6 (25 Civ. 9592). When DHS formally appealed on August 21, 2025, it attached an "EOIR-43 Senior Legal Official Certification," which also did not contain any individualized assessment regarding E.M.M.'s continued detention or the need to preserve the status quo. *See* E.M.M. Petition ¶¶ 32-33.

On November 17, 2025, E.M.M. filed his initial habeas petition pursuant to 28 U.S.C. § 2241, challenging DHS's automatic stay of the Immigration Judge's bond order as an unlawful denial of due process, and seeking his immediate release. ECF No. 1 at 27 (25 Civ. 9592). On November 19, 2025, this Court ordered Respondents to show cause as to why E.M.M.'s Petition should not be granted pursuant to this Court's decision in *J.M.P. v. Arteta*, --- F. Supp. 3d ---, 2025 WL 2984913 (S.D.N.Y. Oct. 23, 2025), which held that "continuous detention pursuant to the automatic stay" an Immigration Judge's order of release on bond based on 8 U.S.C. § 1226 "deprives [an individual] of liberty without due process of law." *Id.* at *14.

The next day, on November 20, 2025, the Board of Immigration Appeals ("BIA") entered an order vacating the Immigration Judge's bond order, based solely on its determination that E.M.M. is subject to mandatory detention pursuant to 8 U.S.C. § 1225(b)(2)(A) and therefore ineligible for release on bond.  ECF No. 8-1 (25 Civ. 9592).[5]  Following the BIA's decision vacating the Immigration Judge's bond order, E.M.M. filed an Amended Petition on November 20, 2025, arguing that he is not subject to mandatory detention but rather is eligible discretionary release on bond pursuant to 8 U.S.C. § 1226(a).  E.M.M. Petition at 31-32.

On November 25, 2025, Respondents then filed their response to the habeas petition before this Court.  ECF No. 16 (25 Civ. 9592).  In the response, the Government reserved its right to appeal, but conceded that this Court's decision in *Lopez Benitez* "would appear to control the result" of E.M.M.'s Petition because of the similar facts in the two cases, specifically referencing E.M.M.'s extended time living in the United States, and the fact that ICE consistently treated him as subject to 8 U.S.C. § 1226, "including in the documents authorizing the arrest that precipitated the detention at issue."  *Id.* at 4.[6]  The Government also stated that the Court could "decide this matter without further briefing."  *Id.*

In light of these concessions, on November 26, 2025, the Court issued an order granting E.M.M.'s Petition and ordering that he be released from custody, noting that this Opinion and Order would follow.  ECF No. 17 (25 Civ. 9592).  On November 26, 2025, the Government

---

[5] On September 12, 2025, Respondents assert that an Immigration Judge denied E.M.M.'s application for relief and ordered him removed to El Salvador.  So Decl. 1 ¶ 24.  E.M.M.'s appeal of that order of removal is currently pending.  *Id.* ¶ 25.

[6] The Government also expressed its position that Petitioner's challenge of the automatic stay was mooted by the BIA's decision, but further conceded that if that were not the case, then this Court's decision in *J.M.P.*, 2025 WL 2984913, "likely would control the result" of that challenge.  ECF No. 16 (25 Civ. 9592) at 4.

certified by letter that E.M.M. was released from ICE custody.  ECF No. 18 (25 Civ. 9592).

E.M.M. had been detained for more than six months.

**IV.    Chaonan Pang**

Chaonan Pang is a citizen of China.  Declaration of Mincheol So ("So Decl. 2") ¶ 3, ECF

No. 6 (25 Civ. 9952).  Respondents assert that Mr. Pang entered the United States and was arrested

by CBP on April 20, 2023.  *Id.* ¶¶ 3-5.  On April 22, 2023, CBP served Mr. Pang with an NTA

charging him with being inadmissible under Section 212(a)(6)(A)(i) of the INA.  ECF No. 7-1 (25

Civ. 9952).  The NTA designated him as "an alien present in the United States," and not as "an

arriving alien."  *Id.*  On April 25, 2023, Mr. Pang was released on his own recognizance,

memorialized in a Form I-220A.  ECF No. 7-2 (25 Civ. 9952).

Since his release, Mr. Pang has lived in the United States, and currently lives in Flushing,

New York.  Pang Petition ¶ 40.  He is employed as a construction worker and has ties to his local

community, including a local church.  *Id.*  ¶ 43.  He has maintained no criminal history, *id.*, and

has a pending application for asylum.  *Id.* ¶ 46.  On December 1, 2025, Mr. Pang reported to the

ICE office at 26 Federal Plaza for a scheduled check-in, in compliance with his ongoing

obligations.  So Decl. 2 ¶ 14.  During that check-in, ICE cancelled Mr. Pang's release on his own

recognizance, and arrested him.  *Id.*  Respondents assert that this cancellation followed

"appropriate procedures and approval," but there is no indication that any kind of individualized

custody determination was made at that time.  *Id.*  The Form I-200 warrant for Mr. Pang's arrest

cites section 236 of the INA.  ECF No. 7-3 (25 Civ. 9952).  Following his arrest, Mr. Pang was

detained at the Elizabeth Contract Detention Facility in Elizabeth, New Jersey.  So Decl. 2 ¶ 15.

The same day that he was taken into custody, Mr. Pang filed a habeas petition pursuant to

28 U.S.C. § 2241, challenging his detention as unlawful and seeking an order requiring his

immediate release.  Pang Petition at 12-13.  On December 2, 2025, this Court ordered Respondents

to show cause as to why Mr. Pang's Petition should not be granted pursuant to this Court's decision in *Lopez Benitez*, 795 F. Supp. 3d 475. ECF No. 3 (25 Civ. 9952). The Government responded on December 5, 2025, reserving its right to appeal, but conceding that this Court's decision in *Lopez Benitez* "would control the result in this case if the Court adheres to [it]" because of the "materially indistinguishable" facts. ECF No. 7 at 3 (25 Civ. 9952). The Government further stated that the Court could "decide this matter without further briefing." *Id.*

In light of these concessions, on December 6, 2025, the Court issued an order granting Mr. Pang's Petition and ordering that he be released from custody no later than December 7, 2025 at 5:00 p.m., noting that this Opinion and Order would follow. ECF No. 9 (25 Civ. 9952). On December 8, 2025, Respondents submitted a letter regarding the Court's Order of Release. ECF No. 10 (25 Civ. 9952). In their letter, counsel for Respondents explain that they notified ICE of the Order of Release the day it was issued, on December 6, 2025. *Id.* at 1. On December 7, 2025, ICE erroneously notified counsel for Respondents that Mr. Pang had been released, when in fact he had been transferred to Metropolitan Detention Center ("MDC") in Brooklyn, New York. *Id.* Mr. Pang remained in custody at MDC until counsel for Respondents became aware of ICE's noncompliance with this Court's order on December 8, 2025. *Id.* Mr. Pang was released later that day. *Id.*

## DISCUSSION

The discussion in this Opinion proceeds in two parts. First, in light of Respondents' concession that these cases raise the same legal issues previously addressed in *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475 (S.D.N.Y. 2025), the Court applies that decision here and concludes that the Petitions in these cases should be granted. Second, the Court considers a recent opinion issued in this District, *Chen v. Almodovar*, No. 25 Civ. 8350, 2025 WL 3484855 (S.D.N.Y. Dec.

4, 2025), which rejected the reasoning of *Lopez Benitez* and other similar cases.  The Court then explains why it is ultimately not persuaded by the reasoning in *Chen.*

**I.    Application of *Lopez Benitez* to these Cases**

As Respondents acknowledge, this Court decided the legal issues raised by the Petitioners in these cases in *Lopez Benitez v. Francis*, 795 F. Supp. 3d 475 (S.D.N.Y. 2025).  That is, for each of the Petitioners, the outcome turns on whether they were detained pursuant to Section 235 of the INA, 8 U.S.C. § 1225(b) ("Section 1225(b)")—which generally provides for *mandatory* detention of an "arriving alien" who is "seeking admission" to the United States and is "not clearly and beyond a doubt entitled to be admitted"—or if they are subject to detention on a *discretionary* basis under a different provision—Section 236 of the INA, 8 U.S.C. § 1226(a) ("Section 1226(a)"), which generally "authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings."  *Jennings v. Rodriguez*, 583 U.S. 281, 288-89 (2018).  *See also Nielsen v. Preap*, 586 U.S. 392 at 396-97 (holding that Section 1226(a) applies to noncitizens "present in this country"); *Johnson v. Guzman Chavez*, 594 U.S. 523, 527 (2021) ("In the ordinary course, if the Department of Homeland Security (DHS) discovers that an alien is living in the United States without authorization, it may . . . may arrest and detain the alien pending a decision on whether the alien is to be removed from the United States. § 1226(a).").  If the Petitioners are detained under Section 1226(a), then their detentions violate the Due Process Clause, because they were afforded no individualized assessment, such as a determination regarding flight risk and/or danger to the community.  *See Lopez Benitez*, 795 F. Supp. 3d at 498.

Respondents concede that that there are no material differences between the facts of these cases and the facts of *Lopez Benitez.*  *See* ECF No. 12 at 3 (25 Civ. 9456) (stating that circumstances of *Goorakani* and *Lopez Benitez* are "materially indistinguishable"); ECF No. 10 at 3 (25 Civ. 9551) (stating that the circumstances of *Mejia Segovia* and *Lopez Benitez* are "similar"

and the due process claims are "nearly identical"); ECF No 16 at 4 (25 Civ. 9592) (stating that *Lopez Benitez* would "appear to control the result in [*E.M.M.*]"); ECF No. 7 at 3 (25 Civ. 9952) (stating that the facts of *Pang* are "materially indistinguishable" from those of *Lopez Benitez*).[7] Like Mr. Lopez Benitez, all four Petitioners have consistently been treated by DHS as subject to Section 1226(a). All four were initially designated as noncitizens "present" in the United States. In their original Notices to Appear, Mr. Goorakani, E.M.M., and Mr. Pang were charged with removability pursuant to 8 U.S.C. § 1182(a)(6)(A)(i), i.e., as noncitizens "*present* in the United States without being admitted or paroled." (emphasis added). *See Lopez Benitez*, 795 F. Supp. 3d at 481; ECF No. 12 at 1 (25 Civ. 9456); ECF No. 14-1 (25 Civ. 9592); ECF No. 7-1 (25 Civ. 9952). Mr. Mejia Segovia's initial Notice to Appear charged him with removability pursuant to a different provision, 8 U.S.C. § 1182(a)(7)(A)(i)(l), but similarly as a noncitizen "*present* in the United States who has not been admitted or paroled." ECF No. 11-3 (25 Civ. 9551) (emphasis added).

Three of the Petitioners were subject to arrest warrants years ago, and each of those warrants cited Section 1226. In the original I-200 warrants for their arrests, Mr. Mejia Segovia and E.M.M. were both charged with removability pursuant to 8 U.S.C. § 1226. *See Lopez Benitez*, 795 F. Supp. 3d at 481; ECF No. 11-1 (25 Civ. 9551); ECF No. 14-2 (25 Civ. 9592). Likewise, the I-200 warrant for Mr. Pang's re-detention cites 8 U.S.C. § 1226. *See Lopez Benitez*, 795 F. Supp. 3d at 485; ECF No. 7-3 (25 Civ. 9952).

Each of the Petitioners was released from custody (or ordered released by an immigration judge) under Section 1226. Mr. Goorakani and Mr. Pang were released from detention on their own recognizance, a form of release that is available under Section 1226(a), but not under

---

[7] The Court takes these statements as a concession of the principal factual allegations relevant to Petitioners' Due Process claims.

1225(b).[8]  *See Lopez Benitez*, 795 F. Supp. 3d at 481; ECF No. 12 at 1 (25 Civ. 9456); ECF No. 7-2 (25 Civ. 9952).  Mr. Mejia Segovia was released on bond, with a Form I-286 Notice of Custody Determination memorializing his release as pursuant to 8 U.S.C. § 1226.  ECF No. 11-4 (25 Civ. 9551).  And an Immigration Judge also ordered E.M.M. released on bond pursuant to 8 U.S.C. § 1226(a).  So Decl. 1 ¶ 23.

All four Petitioners have filed applications for asylum and maintained no criminal history. *See Lopez Benitez*, 795 F. Supp. 3d at 481; Goorakani Petition ¶ 45; Mejia Segovia Petition ¶¶ 1, 3; ECF No. 1-1 ¶ 11 (25 Civ. 9592); ECF No. 1-2 ¶ 22 (25 Civ. 9592); Pang Petition ¶¶ 43, 46. The Petitioners have resided in the United States for periods ranging from 18 months (Goorakani) to 18 years (E.M.M.).

Earlier this year, they were all detained, with the warrants for Mr. Mejia Segovia, E.M.M., and Mr. Pang clearly specifying that they were issued under Section 236 of the INA—*i.e.*, Section 1226(a).  *See* ECF No. 11-5 (25 Civ. 9551) (Mejia Segovia); ECF No. 14-2 (25 Civ. 9592) (E.M.M.); ECF No. 7-3 (25 Civ. 9952) (Pang); *see also supra* n.6 (Goorakani).  Like Mr. Lopez Benitez, Mr. Goorakani and Mr. Pang were arrested outside of scheduled immigration check-ins.[9] *See Lopez Benitez*, 795 F. Supp. 3d at 481; ECF No. 12 at 2 (25 Civ. 9456); So Decl. 2 ¶ 14.  All

---

[8] Respondents have not furnished documentary evidence of the Form I-200 warrant or formal documentation of Mr. Goorakani's release on his own recognizance, which would specify the statutory authority for Mr. Goorakani's detention and discretionary release.  Given the lack of documentary evidence that Mr. Goorakani was initially detained pursuant to 8 U.S.C. § 1225, and the uncontested fact of his release on his own recognizance—which would have been impossible had he been subject to mandatory detention—the Court credits Petitioner's assertion that his release was pursuant to 8 U.S.C. § 1226.  Goorakani Petition ¶ 34.

[9] Although Respondents assert Mr. Goorakani's arrest was pursuant to § 1225(b) and that a new Form I-200 warrant was issued for the arrest, ECF No. 12 at 1 (25 Civ. 9456), they have not furnished documentary evidence, which would substantiate their assertion that § 1225(b) served as the basis for the arrest.

Petitioners' detentions or re-detentions occurred with no evidence suggesting that Respondents made any kind of individualized custody determination. *See Lopez Benitez*, 795 F. Supp. 3d at 494. Mr. Goorakani, Mr. Mejia Segovia, and Mr. Pang were re-detained without any material change in circumstances that preceded their 2025 arrests. *See Lopez Benitez*, 795 F. Supp. 3d at 494; ECF No. 12 at 3 (25 Civ. 9456); ECF No. 10 at 3 (25 Civ. 9551); ECF No 16 at 4 (25 Civ. 9592); ECF No. 7 at 3 (25 Civ. 9952).

Given that the Government acknowledges that there are no material factual differences between Petitioners' cases and the circumstances in *Lopez Benitez*, the Court applies the same legal standard from that case to each of these cases. For the reasons stated in *Lopez Benitez*, the Court holds that Petitioners were not subject to mandatory detention as noncitizens "seeking admission" to the country under 8 U.S.C. § 1225(b), but rather may be subject to detention only on a discretionary basis under § 1226(a). *See* 795 F. Supp. 3d at 483-491. Furthermore, as in *Lopez Benitez*, there is no evidence of "an individualized assessment as to [Petitioners'] dangerousness or flight risk, or any kind of process at all sufficient to qualify as a valid exercise of discretion." *Id.* at 496. Indeed, there is no evidence of *any* exercise of discretion at all. For the reasons given in *Lopez Benitez*, the Court holds that Petitioners' detentions violated their rights under the Due Process Clause. *See id.* at 491-96.

Moreover, Petitioners were not required to exhaust administrative remedies by appealing to an immigration judge, for the same reasons stated in *Lopez Benitez*. *See id.* at 496-98. Accordingly, as the Court held in *Lopez Benitez*, the Petitions here must be granted, and the Petitioners released from custody. *See id.* at 498.

## II.    *Chen v. Almodovar*

There is, however, one recent decision in this District reaching the contrary conclusion on the legal issues presented in these cases. *See Chen v. Almodovar*, No. 25 Civ. 8350, 2025 WL

3484855 (S.D.N.Y. Dec. 4, 2025). I have carefully considered that thoughtful opinion, but for reasons articulated in *Lopez Benitez* and in more recent opinions issued by other judges in this District[10]—as well as in the first Court of Appeals decision to weigh in preliminarily on these issues, *Castanon-Nava v. U.S. Dep't of Homeland Sec.*, No. 25-3050, 2025 WL 3552514, at *9 (7th Cir. Dec. 11, 2025)—I respectfully disagree. While my views are largely addressed in *Lopez Benitez*, I am compelled to respond briefly to several points raised in *Chen*.

First, on the principal question of statutory construction presented in these cases, *Chen* posits the "possibility . . . that the phrase 'an alien seeking admission' is used as a synonym for 'an alien who is an applicant for admission.'" 2025 WL 3484855, at *5. If that were correct, it would mean that anyone who has unlawfully entered the country—regardless of how long they have resided here—is "seeking admission," and thus subject to mandatory detention under Section 1225(b). But that "construction would render § 1225(b)(2)(A)'s use of the phrase 'seeking admission' superfluous, violating one of the cardinal rules of statutory construction." *Castanon-Nava*, 2025 WL 3552514, at *9. And Congress is presumed to have acted intentionally in choosing different words in a statute, such that different words and phrases should be accorded different meanings. *See Yale New Haven Hosp. v. Becerra*, 56 F.4th 9, 21 (2d Cir. 2022) (describing the "meaningful-variation canon" as "the principle that where a statutory scheme has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea") (*citing Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457-58 (2022)). We need not accept *Chen*'s invitation to hypothesize that the two terms are synonymous, because as

---

[10] *See J.G.O. v. Francis*, No. 25 Civ. 7233, 2025 WL 3040142 (S.D.N.Y. Oct. 28, 2025), *Tumba v. Francis*, No. 25 Civ. 8110, 2025 WL 3079014 (S.D.N.Y. Nov. 4, 2025), *Guzman Cardenas v. Almodovar*, No. 25 Civ. 9169, 2025 WL 3228146 (S.D.N.Y. Nov. 19, 2025), and *Barco Mercado v. Francis*, No. 25 Civ. 6582, 2025 WL 3295903 (S.D.N.Y. Nov. 26, 2025).

explained in *Lopez Benitez*, the statutory definition of "applicant for admission" differs from the ordinary meaning of "seeking admission." *See* 795 F. Supp. 3d at 489. The latter refers only to those individuals who are entering or attempting to enter the country.

And there is another reason to reject *Chen*'s suggestion that "seeking admission" includes anyone who has ever entered the country illegally, no matter how long ago. As explained in *Barco Mercado v. Francis*, No. 25 Civ. 6582, 2025 WL 3295903, at *6 (S.D.N.Y. Nov. 26, 2025), the title of Section 1225—which refers to "expedited removal of inadmissible arriving aliens," 8 U.S.C. § 1225—makes clear that its provision requiring mandatory detention is limited only to those *arriving* in the country. The statute has a precise definition of the term "applicant for admission"—it is a term of art that includes two categories of noncitizens: (1) those who already "present in the United States who ha[ve] not been admitted," and (2) those who "arrive[] in the United States." 8 U.S.C. § 1225(a)(1). So, under the statute, one can be an "applicant for admission" either by being "present in the United States" after having entered unlawfully, or by "arriv[ing] in"—that is, coming to—the United States. *See Arrive*, Merriam-Webster, https://www.merriam-webster.com/dictionary/arrive ("[T]o reach a destination") (last visited December 10, 2025). But as *Barco Mercado* explains, the title of Section 1225 makes clear that its provisions on expedited removal apply only to the latter category, referring to "inadmissible *arriving aliens*"—and not to all "applicants for admission." 2025 WL 3295903, at *6; 8 U.S.C. § 1225 (emphasis added). "[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text." *INS v. Nat'l Ctr. Immigrants' Rts., Inc.*, 502 U.S. 183, 189 (1991); *see also Barco Mercado*, 2025 WL 3295903, at *6 n.32 (citing Antonin Scalia & Bryan A Garner, Reading Law 221 (2012) ("The title and headings are permissible indicators of meaning.")).

That conclusion is reinforced by the relevant implementing regulations, promulgated only a few months after passage of the statute, which define the term "arriving alien" as "an applicant

17

for admission *coming or attempting to come into* the United States"—once again underscoring that Section 1225(b)'s provision regarding mandatory detention does not apply to all "applicants for admission," but only to those who are crossing the border or attempting to do so.  *See Martinez v. Hyde*, 792 F. Supp. 3d 211, 219 (D. Mass. 2025) (citing 8 C.F.R. § 1.2) (emphasis added).  While not binding, such regulations provide relevant guidance where, as here, they are "issued roughly contemporaneously with enactment of the statute and" have "remained consistent over time." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).

In sum, the statutory text, title, and contemporaneously-adopted implementing regulations all point to the same conclusion: that "applicants for admission" is not a synonym for noncitizens "seeking admission."  Mandatory detention under Section 1225(b) applies only to those applicants for admission who are seeking admission—i.e., "arriving aliens," or those who are entering (or attempting to enter) the country, and not those who are already present or reside here.

Second, *Chen* states that an asylum applicant should be subject to mandatory detention under Section 1225(b) because "seeking asylum is 'seeking admission,' within the meaning of the statute, since 'admission' is defined in terms of 'lawful' status, 8 U.S.C. § 1101(a)(13)(A), not physical presence on U.S. soil."  2025 WL 3484855, at *6.  But the full text of 8 U.S.C. § 1101(a)(13)(A) reads: "The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful *entry* of the alien into the United States after inspection and authorization by an immigration officer."  (emphasis added).  While "lawful" appears within this text, *Chen* ignores the following word: "entry."  "Entry has long been understood to mean a crossing into the territorial limits of the United States."  *Pie v. Noem et al.*, 25 Civ. 1564, 2025 WL 3496156, at *5–6 (W.D. Mich. Dec. 5, 2025).  Obviously, one can "enter" the country lawfully (i.e., "admission"), or unlawfully.  *See Hing Sum v. Holder*, 602 F.3d 1092, 1100-01 (9th Cir. 2010) (explaining that, in enacting Sections 1225 and 1226, Congress adopted "the BIA's case law as it stood in 1996," which distinguished

between "admission," which "referred to a 'lawful' entry' . . . as opposed to . . . 'unlawful' entries"). To the extent that asylum applicants already within the United States continue to "seek" something, it is not "entry" to the country; they are already here. Rather, these applicants seek a lawful means to *remain* in the United States. *Compare Entry*, Merriam-Webster, https://www.merriam-webster.com/dictionary/enter ("[T]he act of entering") (last visited December 8, 2025), *with Remain*, Merriam-Webster, https://www.merriam-webster.com/dictionary/remain ("[T]o stay in the same place or with the same person or group") (last visited December 8, 2025); *see also Lopez Benitez v. Francis*, 795 F. Supp. 3d 475, 489 n.7 (S.D.N.Y. 2025).[11]

Third, *Chen* states that *Lopez Benitez* would "virtually nullify Section 1225(b)(2)," 2025 WL 3484855, at *5, but that is incorrect. In recent years, CBP has encountered anywhere from four hundred thousand to 2.4 million noncitizens annually at the Southwest Border alone.[12] It is hardly radical to interpret Section 1225(b) as it has always (until very recently) been applied—that is, to hundreds of thousands or even millions of noncitizens annually who are "seeking admission" to the country but lack lawful authorization to so. Rather, it is the government's *current* treatment of essentially everyone who has entered the country illegally as subject to mandatory detention

---

[11] Although *Chen* is unclear on this point, it appears that its interpretation of the statute—treating "seeking asylum" as a form of "seeking admission"—would deem all asylum applicants to be "applicants for admission." But that would mean that someone who enters the United States lawfully and then applies for asylum would be "seeking admission" to the country, which would make little sense as a textual matter because such individuals have already been "admitted" to the country. It would also have extremely broad implications, as it would potentially subject all asylum applicants to mandatory detention as "applicants for admission" under Section 1225(b).

[12] According to CBP, annual encounters with undocumented immigrants at the Southwest Border alone have ranged from 443,671 to 2,475,669 in recent years. *See* U.S. Customs & Border Prot., *Sw. Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters [https://perma.cc/6DPQ-ME6P] (last visited Dec. 10, 2025).

that is "inconsistent with how immigration law in this country long has worked." *Barco Mercado*, 2025 WL 3295903, at *9; *see also Castanon-Nava*, 2025 WL 3552514, at *9 ("[T]he difference in treatment between a noncitizen at the border and one already in the United States fits within the broader context of our immigration law."); *Lopez Benitez*, 795 F. Supp. 3d at 490 (noting that the government's "novel position would expand § 1225(b) far beyond how it has been enforced historically.").

And here, once again, early implementing regulations are instructive. As *Barco Mercado* notes, *see* 2025 WL 3295903, at *8, shortly after Section 1225(b)'s enactment, the Department of Justice issued an interim rule explaining that "applicants for admission" who are already present in the United States are *not* subject to mandatory detention: "[d]espite being applicants for admission, noncitizens who are present without having been admitted or paroled . . . will be eligible for bond and bond redetermination." Detention and Removal of Noncitizens, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). While *Chen* proclaims that "[t]here is no support in statutory text, precedent, or legislative history for the conclusion that Section 1225(b)(2) does not apply to aliens who are 'already here' after having illegally entered the country," 2025 WL 3484855, at *5, that would come as a surprise to every previous administration—including the administration in place when the statute was adopted, and the last administration led by the incumbent President.

Fourth, *Chen* dismisses as "alchemy" *Lopez Benitez*'s reasoning that Respondents' interpretation of the statute would render the amendments to Section 1226(c) adopted via the recently enacted Laken Riley Act largely redundant. *Id.*, at *6. But it is hardly a form of magic to point out that the recent amendments to Section 1226(c) requiring mandatory detention for inadmissible noncitizens involved in certain criminal conduct "would have had no legal effect under the government's reading because the mandatory detention of those very same people would have been required under § 1225 . . . ." *J.G.O. v. Francis*, No. 25 Civ. 7233, 2025 WL 3040142,

at *4 (S.D.N.Y. Oct. 28, 2025); *see also Lopez Benitez*, 795 F. Supp. 3d at 490.  If *Chen*'s interpretation of Section 1225(b) as requiring mandatory detention for all inadmissible noncitizens were correct, then there would be no need for Section 1226(c)'s requirement of mandatory detention for inadmissible noncitizens who *also* engage in certain criminal conduct.  *See J.G.O.*, 2025 WL 3040142, at *4.

Even leaving that aside, there is another problem.  Recall that in *Chen*'s telling, Section 1226 applies only to those who have entered the country lawfully on a visa, and then remain here unlawfully beyond their visa's expiration date.  *See* 2025 WL 3484855, at *7.  But if that were correct, then Section 1226(c) would not even apply to the events that inspired it—the tragic murder of Laken Riley, which was committed not by someone who overstayed a visa, but by someone "who entered the United States unlawfully," and who, according to *Chen*, would already have been subject to mandatory detention under Section 1225(b).  *Barco Mercado*, 2025 WL 3295903, at *7. It is difficult to think of an interpretation of a statute that would more clearly render a recent amendment to it redundant than this.  *Cf. Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

*Chen* points to floor statements by two sponsors of the Laken Riley Act asserting that it was necessary "because of their perception that the Executive Branch had failed to enforce the detention options that were already available to it."  2025 WL 3484855, at *6.  This is somewhat confusing, because detention under Section 1225(b) is by its terms, mandatory, and not merely an "option."  More to the point, "floor statements by individual legislators rank among the least illuminating forms of legislative history," even when the statements are made by a bill's sponsors. *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017).  *See also United States v. Hayes*, 555 U.S. 415, 434 (2009) (Roberts, C.J., dissenting, joined by Scalia, J.) (stating that "tidbits" such as "a

statement on the floor . . . by the bill's sponsor . . . do not amount to much."). In any event, this Court is aware of nothing in the relevant legislative history (let alone the statutory text) to suggest that Congress understood Section 1226(c) to have the limited scope that *Chen* necessarily suggests (i.e., that it applies only to those overstaying their visas who engage in certain criminal conduct).

Fifth, *Chen* faults *Lopez Benitez* for purportedly adopting "the proposition that if one presidential administration fails to enforce a statute, the next administration cannot enforce it, even though the statute clearly applies . . . ." 2025 WL 3484855, at *7. But that is not what this Court held. This Court agrees that DHS "has wide discretion" and "may shift its enforcement priorities and adopt internal policies meant to effectuate those priorities. And the adoption of new policies may, of course, have significant consequences, resulting in different kinds of detention determinations than were made previously, including on a broad scale." *Lopez Benitez*, 795 F. Supp. 3d at 494. But the question here is whether *these Respondents*, serving in *this administration*, can assert that they are detaining an individual on a discretionary basis citing their authority to do so under Section 1226(a), and then, when that purported exercise of discretion is challenged in court, suddenly shift gears and say that they actually had no discretion at all, because such detention is *mandatory* under a different statutory provision, Section 1225(b).

To make this concrete: Mr. Mejia Segovia entered the United States almost a decade ago, in February 2016. He was initially detained under Section 1226(a) by CBP, and released on bond under that provision. He has lived here ever since. E.M.M. has lived here even longer, for 18 years. Respondents arrested and detained them earlier this year, under warrants issued pursuant to Respondents' discretionary authority under Section 1226(a)—that is, treating the Petitioners as noncitizens who are "already in the country." *Jennings*, 583 U.S. at 288-89. But once these detentions were challenged in court, Respondents changed their stories, now insisting that there is no discretion at all because detention is mandatory in these cases, on the grounds that Petitioners—

despite living here in some cases for many years—are "seeking admission" to the country under Section 1225(b).

Respondents' previously consistent treatment of Petitioners as subject to discretionary detention under the latter provision is fatal to their position in these cases. "The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted," not on "impermissible *post hoc* rationalizations." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22, 24 (2020); *see also Biden v. Texas*, 597 U.S. 785, 808 (2022). Petitioners have been detained for periods ranging from about a week to more than six months. Deprivation of liberty is a serious matter; it must not turn on the outcome of a shell game.

All of this underscores a related point: these cases are ultimately not about whether the government has the power to detain these individuals, nor whether detention of these individuals is, in some sort of objective sense, appropriate. On the former question, no one denies that, under Section 1226(a), the government has broad discretion to make determinations whether to detain noncitizens who are "already in the country pending removal proceedings." *Jennings*, 583 U.S. at 288-89. And on the latter, this Court is not tasked here with making such an assessment. Rather, these cases are about whether Respondents have complied with their statutory duty to make some sort of individualized determination before detaining these individuals, rather than simply asserting—contrary to the plain language of the statute and decades of practice—that they have no choice but to do so. The fact that Respondents have declined any effort to defend these and hundreds of other detentions on the merits as valid exercises of discretion suggests either that they are unwilling to state their reasons and subject them to public scrutiny, or that they are simply unable to articulate any legitimate reasons for these detentions whatsoever. But "when so much is at stake, . . . 'the Government should turn square corners in dealing with the people.'" *Regents*,

591 U.S. at 24 (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)).

Finally, while *Chen* acknowledges its minority status, and notes that "a number of judges in this District, and elsewhere have ruled otherwise," 2025 WL 3484855, at *4, that is something of an understatement.  In fact, as of November 26, 2025, "the overwhelming, lopsided majority" of courts that have considered this question—"in 350 of [362] cases decided by over 160 different judges sitting in about fifty different courts spread across the United States"—have reached the same conclusion that this Court reached in *Lopez Benitez*.  *Barco Mercado*, 2025 WL 3295903, at *4; *see also id.* at *13 (string cites listing 362 cases considering the question presented here).  And since then, the only Court of Appeals to weigh in preliminarily thus far, the Seventh Circuit, has agreed.  *See Castanon-Nava*, 2025 WL 3552514, at *9.

Reasonable minds can differ and often do—sometimes vehemently so—on difficult and important legal questions.  No judge is infallible, and one thing of which I am certain is that I am not.  But I do not think that so many of my brethren are "feigning oblivion" or practicing "alchemy."  *Chen*, 2025 WL 3484855 at *6.  To be sure, none of these decisions are binding here, and more courts will surely weigh in on these issues before long.  And whatever additional authority from higher courts may be forthcoming, district courts will faithfully apply it.  Until then, we will continue to try our best to wrestle with complicated questions of law in good faith, as I am sure my colleagues—including those with whom I respectfully disagree—are doing on a daily basis.

## CONCLUSION

For the reasons stated above, Mr. Goorakani's, Mr. Mejia Segovia's, E.M.M.'s, and Mr. Pang's Petitions are **GRANTED**.  Respondents are further **ENJOINED** from re-detaining Petitioners without a valid exercise of discretion consistent with this Order.  *Cf Hyppolite v. Noem*,

25 Civ. 4304, 2025 WL 2829511, at *16 (E.D.N.Y. Oct. 6, 2025).  It is further **ORDERED** that Respondents are **ENJOINED** from denying bond to Petitioners in any subsequent proceeding on the basis that they must be detained pursuant to: (1) 8 U.S.C. § 1225(b), or (2) 8 U.S.C. § 1226(c) absent a change in relevant circumstances consistent with this Order; and it is further **ORDERED** that, if Petitioners are granted bond, Respondents are **ENJOINED** from invoking the automatic stay provision at 8 C.F.R. § 1003.19(i)(2).  Order, *Aguilar Lares v. Bondi*, No. 25-CV-01562 (E.D. Va. Oct. 29, 2025), Dkt. No. 19.

Counsel for Petitioners may file applications for attorney's fees and costs pursuant to 5 U.S.C. § 504 and 28 U.S.C. § 2412 within the time provided by the Local Rules.

The Clerk of Court is respectfully directed to enter judgment in Petitioners' favor in each of these cases pursuant to F.R.C.P. 58.

SO ORDERED.

Dated:  December 15, 2025

New York, New York

_____
DALE E. HO
United States District Judge